**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 18-cr-88 (TSC)** |
| | : | |
| **v.** | : | |
| | : | |
| **KEMAL OKSUZ,** | : | |
| | : | |
| **Also Known as** | : | |
| **Kevin Oksuz** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

*FILED*

*DEC 10 2018*

*Clerk, U.S. District and*
*Bankruptcy Courts*

**STATEMENT OF THE OFFENSE**

Pursuant to Fed. R. Crim. P.11, the United States of America, by and through its attorneys for the United States Attorney's Office for the District of Columbia, the Public Integrity Section of the United States Department of Justice, Criminal Division, and the United States Department of Justice Counterintelligence and Export Control Section, National Security Division (hereinafter collectively "the United States"), and the defendant, KEMAL OKSUZ ("defendant OKSUZ"), with the concurrence of his attorney, agree and stipulate as follows:

**Background**

1.     Defendant OKSUZ is a citizen of the United States.  Between in or about January 2013 and in or about June 2014, Defendant OKSUZ was the president of the non-profit organization Turquoise Council of Americans and Eurasions ("TCAE").  TCAE, which had its principal place of business in Houston, Texas, sought to establish closer relations between the Turkic American Community and the local community at large by coordinating cultural exchanges and organizing trips to Turkey and surrounding countries.

1

2.      The Turkic American Alliance ("TAA") was created as an umbrella organization for six regional federations and over 240 local member organizations across the country, including TCAE.  Its mission was to assist Turkic communities in cultural pursuits and connect them to governments, media outlets, and educational opportunities.  TAA was a non-profit organization located in Washington, D.C., with a board consisting of the leaders of the six regional federations.

3.      In or about April 2013, TCAE, TAA and some of its regional federations invited several Members of Congress and their staff on a privately-sponsored trip to Turkey and Azerbaijan that was to take place in May 2013 (the "Trip"). During the portion of the Trip in Azerbaijan, Congressional Members and Staffers were to attend a convention in Baku, Azerbaijan entitled "U.S. – Azerbaijan: Vision for the Future" (the "Convention"), which was to focus on energy and trade issues. The Convention was attended by state and local government officials, energy company executives, academics, officials from the federal government, and other interested parties from the United States and other countries.

4.      The Assembly of the Friends of Azerbaijan ("AFAZ") was a non-profit organization focused on promoting United States-Azerbaijan relations in business, culture, and education.  AFAZ was unaffiliated with TCAE or TAA. Beginning in or about April 2013, OKSUZ was the President of the AFAZ board of directors.  During all times relevant, AFAZ had no employees.

5.      The State Oil Company of Azerbaijan Republic ("SOCAR") is a wholly state-owned national oil and gas company headquartered in Baku, Azerbaijan.  During all times relevant, SOCAR had one office in the United States, SOCAR USA, which acted as its

representative for government and business affairs.  R.M. was the director of SOCAR USA and reported directly to the CEO of SOCAR in Azerbaijan.

6.       Practical Solutions Group ("PSG") was a consulting firm based in Azerbaijan, which incorporated an entity in the United States ("PSG USA") in March 2012.  I.A., who also served on AFAZ's board of directors, was PSG USA's president.

7.       Travel Agency A was, during all relevant times, a travel agency based in Brooklyn, New York.

### House Travel Guidelines and Regulations

8.       Privately-sponsored travel by Members of the United States House of Representatives ("Members") and their staff ("Staffers") is regulated by the United States House of Representatives Committee on Ethics ("Ethics Committee") through the United States House Travel Guidelines and Regulations ("House Travel Regulations"). To ensure compliance with these regulations, the Ethics Committee requires Members and Staffers who wish to accept privately-sponsored travel to seek and receive written authorization from the Ethics Committee prior to such travel. The House Travel Regulations also require sponsors of such travel to complete and submit to the Members and Staffers, both before and after privately-sponsored Congressional trips, "Trip Sponsor Forms" and "Post-Travel Forms" certifying, among other information, the source of funds used to pay for the sponsored travel. The Members and Staffers in turn submit the forms to the Ethics Committee who use the forms to evaluate and approve or deny any request to participate in a privately-sponsored trip.

9.       The Trip Sponsor Form and Post-Travel Form both include a certification that the "information contained in [each form] is true, complete, and correct to the best of [the trip sponsor's] knowledge" as well as the following bolded warning:

3

**Willful or knowing misrepresentations on this form may be
subject to criminal prosecution pursuant to 18 U.S.C. § 1001.**

**Defendant's Scheme to Falsify, Conceal and Cover Up Material Facts from Congress**

10.     From in or about January 2013 to in or about June 2013, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States, and in connection with an administrative matter and review conducted pursuant to the authority of a committee of the United States Congress, consistent with applicable rules of the House of Representatives, defendant OKSUZ knowingly and willfully falsified, concealed, and covered up by a trick, scheme, and device a material fact, in that, during the House Ethics Committee administrative matter and review of the Trip and Convention, Defendant OKSUZ, intended to and did misrepresent and conceal the true nature and extent of funding provided by SOCAR for the Trip and Convention.

**Defendant OKSUZ Made False Representations to Obtain Approval for the Trip**

11.     Between in or about January 2013 and in or about June 2013, the Ethics Committee conducted an inquiry and review of the details surrounding the Trip, which was initiated when Defendant OKSUZ and others known and unknown to the United States, invited several Members of Congress and their staff on the Trip.

12.     Several Members and Staffers accepted the invitations and sought approval from the Ethics Committee to go on the Trip and travel to Turkey and Azerbaijan and attend the Convention.

13.     As a purported trip sponsor, and as required by the House Travel Regulations, Defendant OKSUZ, on behalf of TCAE, completed and submitted the following seven (7) Trip Sponsor Forms to sponsor five (5) Members and two (2) Staffers:

      a.   Trip Sponsor Form submitted for House Member R.H.;

      b.   Trip Sponsor Form submitted for House Member J.B.;

      c.   Trip Sponsor Form submitted for House Member S.J.;

      d.   Trip Sponsor Form submitted for House Member T.P.;

      e.   Trip Sponsor Form submitted for House Member M.G.;

      f.   Trip Sponsor Form submitted for House Staffer D.A.;

      g.   Trip Sponsor Form submitted for House Staffer A.T.

14.     In each Trip Sponsor Form, Defendant OKSUZ checked a box representing that TCAE had "not accepted from any other source funds intended directly or indirectly to finance any aspect of the trip." Defendant OKSUZ certified, for each form, "the information contained in this [Trip Sponsor Form] is true, complete, and correct to the best of my knowledge."

15.     In or about January 2013, through in or about April 2013, the Ethics Committee conducted a review of documents submitted by Members and their Staffers, including the Trip Sponsor Forms, in order to determine whether such travel by the Members and Staffers was in compliance with House Travel Regulations. The Ethics Committee relied on the truthfulness and accuracy of the information provided in the Trip Sponsor Forms when conducting their review of each Members and Staffers' request for approval to travel on the Trip.

**Defendant OKSUZ Obtained Funds from SOCAR and Other Sources to Finance the Trip**

16.     In April 2013, Defendant OKSUZ hired Travel Agency A to help coordinate and purchase all travel reservations associated with the Trip, including the airfare that was to be paid for transporting the Members and their Staffers to and from Turkey and Azerbaijan.

17.     To pay for the travel reservations made by Travel Agency A, Defendant OKSUZ wired funds from bank accounts owned by TCAE and AFAZ to a bank account owned by Travel Agency A.

*Funding Funneled from SOCAR and AFAZ*

18.     In or about April 2013, Defendant OKSUZ, and others known and unknown to the United States, adopted the AFAZ bylaws and appointed Defendant OKSUZ President of AFAZ.

19.     In or about May 2013, Defendant OKSUZ executed an agreement on behalf of AFAZ securing a $750,000 payment from SOCAR "to organize the Convention taking place in Baku, Azerbaijan on May 28-29, 2013." Notwithstanding OKSUZ's representation to the Ethics Committee that TCAE did not accept funding for the Trip from any other source, the agreement stated that SOCAR's $750,000 payment, which was half the projected budget for the Convention, would cover "accommodation, travelling expenses, venue rental and all other related expenses and fees." An attachment to the agreement sets out the "Proposed Budget for the Convention":

Proposed Budget for the Convention

| Estimate Proposed Budget for the Convention | |
|---|---|
| SERVICE ITEMS | AMOUNT |
| Convention Organization | $     50,000.00 |
| Hotel and Accommodations | $   100,000.00 |
| Marketing and Advertising | $     25,000.00 |
| Food &Entertainment | $     75,000.00 |
| International Preparation Fee (structure, employees, transportation) | $1,250,000.00 |
| Miscellaneous | N/A |
| TOTAL | $1,500,000.00 |

20.     Defendant OKSUZ opened a Wells Fargo business checking account in the name of AFAZ ending in 9537 ("AFAZ Checking Account") on or about February 8, 2013. In May 2013, Defendant OKSUZ was the only authorized signatory on the account. Records show that on or about May 2013 through July 2013, large wire transfers were made from SOCAR and

6

other companies later identified as corporate sponsors for the Convention, to the AFAZ
Checking Account, as follows:

| Date of Deposit | Sponsor | Amount Deposited into AFAZ |
|---|---|---|
| 5/14/13 | SOCAR | $750,000 |
| 5/16/13 | Company A | $50,000 |
| 5/31/13 | Company B | $10,000 |
| 6/13/13 | Company C | $10,000 |
| 6/21/13 | Company D | $10,000 |
| 7/12/13 | Company E | $10,000 |

21.     Prior to the May 14, 2013, deposit from SOCAR, AFAZ had only $283.15 in its
checking account. Records also show that from the date AFAZ's Checking Account was opened
until the May 14, 2013, SOCAR deposit, the account had not carried a balance greater than
$283.15.

22.     On or about May 16, 2013, AFAZ wired $378,452 from the AFAZ Checking
Account to Travel Agency A.  Five days later on May 21, 2013, AFAZ wired another $85,948
from the AFAZ Checking Account to Travel Agency A.  In bank documents, Defendant OKSUZ
described that the May 2013 transfers to Travel Agency A were for "transportation for US-
Azerbaijan conference" or for "US-AZ convention transportation."

### Funding Funneled from SOCAR and PSG

23.     On or about February 8, 2013, PSG and SOCAR entered into an agreement for
PSG to provide aid in planning events to promote Azerbaijan and SOCAR.  On or about April
23, 2013, PSG and SOCAR executed a work order for PSG to provide aid in planning the
Convention.

24.     Notwithstanding Defendant OKSUZ's representation to the Ethics Committee that
TCAE did not accept funding for the Trip from any other source, in or about April 2013,

7

Defendant OKSUZ executed an agreement on behalf of TCAE securing a $750,000 payment from PSG for the "US-Azerbaijan Convention Baku 2013" ("TCAE-PSG Agreement"). The agreement sets out the below estimated budget for the Convention, which is identical to the proposed budget attached to the agreement Defendant OKSUZ executed between AFAZ and SOCAR:

Convention's Estimated Total Budget: $1,500,000

1. Convention Organization: $50,000
2. Hotel and Accommodations: $100,000
3. Marketing and Advertising: $25,000
4. Food & Entertainment: $75,000
5. International Preparation Fee (structure, employees, transportation, etc.):$1,250,000
6. Miscellaneous: N/A

25.     The TCAE-PSG Agreement further states that PSG's "contribution of 50 percent of total expenses will be used toward any of the above mentioned expenditures" and that "[PSG] and [SOCAR] will be identified as the sponsors of the event and the company name and/or logo will appear on all advertising and event materials."

26.     On or about May 7, 2013, TCAE owned a Wells Fargo business checking account ending in 5513 ("TCAE Checking Account") and carried a balance of approximately $40,509.22. Notwithstanding OKSUZ's representation to the Ethics Committee that TCAE did not accept funding for the trip from any other source, on or about May 7, 2013, PSG wired $750,000, or half the projected budget for the Convention, from a bank located in Azerbaijan into TCAE's Checking Account. Three days later on May 10, 2013, TCAE wire transferred $515,235 to Travel Agency A to pay for Trip-related travel bookings.  Without the funds transferred from PSG, TCAE would have had insufficient funds to wire transfer $515,235 to Travel Agency A.

27.     On or about May 21, 2013, TCAE wire transferred from its checking account approximately $153,693 to Travel Agency A to pay for Trip-related travel.

28.     On or about May 21, 2013 through in or about June 2013, TCAE and PSG amended the TCAE-PSG Agreement, increasing the proposed budget for the Convention to $2,275,000 and PSG sent an additional $774,642.14 in wire transfer payments to TCAE.

### Post-Travel Forms

29.     Following their return from Turkey and Azerbaijan in May or June of 2013, Members and Staffers compiled and filed with the Clerk of the House disclosure forms required by the House Travel Regulations, which included a completed Post-Travel Form for each traveler.

30.     In or about June 2013, as required by the House Travel Regulations, Defendant OKSUZ completed and submitted the following seven (7) Post-Travel Forms on behalf of the same five (5) congressional Members and two (2) Staffers for which he had previously submitted Trip Sponsor Forms:

       a.   Post-Travel Form submitted for House Member R.H.;

       b.   Post-Travel Form submitted for House Member J.B.;

       c.   Post-Travel Form submitted for House Member S.J.;

       d.   Post-Travel Form submitted for House Member T.P.;

       e.   Post-Travel Form submitted for House Member M.G.;

       f.   Post-Travel Form submitted for House Staffer D.A.;

       g.   Post-Travel Form submitted for House Staffer A.T.

31.     Notwithstanding the fact that, as discussed above, TCAE had received funds from SOCAR, PSG, and AFAZ to fund the Trip and Convention, in each Post-Travel Form, Defendant

OKSUZ represented (a) that TCAE was the respective Trip Sponsor "who paid for the trip" and (b) the specific amounts TCAE allegedly paid for in transportation, lodging and meal expenses, amongst others, on behalf of the above-referenced seven Members and Staffers. Defendant OKSUZ certified, for each form, "the information contained in this [Post-Travel Form] is true, complete, and correct to the best of my knowledge."

32.     In or about June 2013, the Ethics Committee conducted a review of Post-travel disclosures submitted to the Clerk of the House by the Members and Staffers, including the Post-Travel Forms, in order to determine whether the Trip to Turkey and Azerbaijan by the Members and Staffers complied with House Travel Regulations. The Ethics Committee relied on the truthfulness and accuracy of the information provided in the Post-Travel Forms when conducting their review of each Members and Staffers' Post-travel disclosures.

Respectfully submitted,

Jessie K. Liu
United States Attorney for the District of Columbia

By:     David Misler
Assistant United States Attorney

AnnaLou Tirol
Acting Chief
U.S. Department of Justice, Criminal Division
Public Integrity Section

By:     Marco Palmieri
Trial Attorney

Jay Bratt
Acting Chief
U.S. Department of Justice, National Security Division
Counterintelligence and Export Control Section

By: ___Will Mackie / MAP___

Will Mackie
Trial Attorney

## DEFENDANT'S ACKOWLEDGEMENT

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me. It does not include all of the facts known to me regarding this offense. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crime charged. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

I have read every word of this Statement of the Offense, or have had it read to me. Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorney, I agree and stipulate to this Statement of the Offense, and declare under penalty of perjury that this is true and correct.

Date: 12/06/2018

Kemal Oksuz
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt and stipulate to this Statement of the Offense as true and accurate.

Date: 12/6/18

Philip Inglima
Attorney for Defendant

12